## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 24 2020, 9:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrea L. Ciobanu
Ciobanu Law, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Cassandra A. Kruse
Emswiller, Williams, Noland &
Clarke, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sean Milligan, <br> *Appellant/Respondent,* <br><br> v. <br><br> Kelli Milligan, <br> *Appellee/Petitioner.* | August 24, 2020 <br><br> Court of Appeals Case No. <br> 20A-DC-412 <br><br> Appeal from the Marion Superior Court <br><br> The Hon. Gary L. Miller, Judge <br><br> The Hon. Deborah J. Shook, Magistrate <br><br> Trial Court Cause No. <br> 49D03-1702-DC-7323 |

**Bradford, Chief Judge.**

# Case Summary

[1] Sean and Kelli Milligan ("Father" and "Mother," respectively) are the parents of A.M., who was born in 2012, when Father and Mother were still married. In 2014, Father was convicted of Level 6 felony sexual battery of Mother's daughter from a prior relationship and was required to register as a sex offender for ten years. In around 2016, Father and Mother divorced. For a time, Father and Mother had joint legal and shared physical custody of A.M. In October of 2018, while exercising parenting time with A.M., Father was arrested for failing to register as a sex offender. In June of 2019, the trial court issued an order on several pending matters, awarding, *inter alia*, Mother sole legal custody of A.M. as to healthcare matters due to Father's interference with A.M.'s therapy.

[2] On July 11, 2019, Father was arrested on a new charge of failing to register as a sex offender, and instead of informing Mother or offering her additional parenting time, left A.M. with a friend. The same day, Mother filed an emergency motion for modification of custody, request for modification of parenting time, and motion for rule to show cause why Father should not be held in contempt of court for failing to notify her of his arrest or offer her additional parenting time. In August of 2019, Mother filed an additional motion for rule to show cause based on Father's failure to pay child support. Also in August of 2019, the trial court ordered Father to undergo a psychosexual evaluation, which was conducted in November.

[3] In December of 2019, the trial court ordered that Father be limited to supervised visitation once a week, was not entitled to private telephone

conversations with A.M., and was limited to once-a-month communication with A.M.'s therapist, in writing. The trial court also found Father in contempt of court for failing to pay child support as ordered; inform Mother of his July 11, 2019, arrest; and offer her additional parenting time after that arrest. The trial court also awarded Mother $2000.00 in attorney's fees. Father contends that the trial court abused its discretion in limiting him to supervised visitation with A.M., forbidding private telephone calls, limiting his access to A.M.'s therapist, finding him to be in contempt for failing to inform Mother of his July 11 arrest, and finding him to be in contempt for failing to offer Mother additional parenting time following that arrest. Because we disagree with all of Father's contentions except for the second-to-last, we affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[4] Father and Mother married in 2011, and their daughter A.M. was born in June of 2012. In 2014, Father was convicted of Class D felony sexual battery of his twelve-year-old stepdaughter (and A.M.'s half-sister) and was required to register as a sex offender for ten years. In around 2016, Father and Mother divorced. On July 28, 2017, the trial court awarded joint legal and shared physical custody of A.M. to Parents.

[5] Between April of 2018 and April of 2019, both parties filed several motions and petitions with the trial court. Meanwhile, in October of 2018, Father was arrested for failing to register as a sex offender while A.M. was in his care, and he notified Mother, who was able to retrieve A.M. before Father was taken into

formal custody. On June 25, 2019, the trial court issued an order on outstanding matters, ordering, *inter alia*, modification of custody such that Father and Mother were awarded joint legal custody of A.M., awarding Mother sole legal custody of A.M. with respect to healthcare decisions, and granting Father parenting time consistent with the Indiana Parenting Time Guidelines. The trial court's order contained the following findings regarding A.M.'s participation in counseling:

> 20. Neither party disputes that on August 23, 2018, Mother contacted Father about [A.M.] starting counseling.
>
> […]
>
> 22. Neither party disputes that prior to Mother reaching out to Father to obtain his consent, [A.M.] had not yet begun counseling.
>
> 23. Father consented to [A.M.] starting counseling services, both Mother and Father had individual intake appointments and [A.M.] started counseling with Kimberly Joyce.
>
> 24. After [A.M.] began counseling, Father revoked his consent. Mother then ceased the counseling until permitted by order of this Court to resume the same.
>
> [….]
>
> 27. [A Domestic Relations Counseling Bureau ("DRCB")] report supported [A.M.]'s counseling, recommending that it continue and found troubling the fact Father insisted it be terminated.
>
> [….]
>
> 53. On the date of the final hearing, [A.M.] was finishing first grade in Fishers, had been in counseling with [Joyce] for nearly eight months, the parties had utilized the services of the parenting coordinator [("the PC")], participated in

a DRCB investigation, Father was arrested during his parenting time for failing to properly register as a sex offender, and both parties had been investigated by DCS.

[….]

57.     After Father's revocation of his consent to therapy for [A.M.], because the parties shared legal custody, Mother was forced to seek an order from the Court to resume the [A.M.]'s therapy because Father refused to provide consent for the same.

58.     At the date of final hearing, [A.M.]'s therapy was again interrupted and was scheduled to terminate after the school year with no new therapist in place for summer.

59.     Father acknowledged he demanded a meeting with the therapist's supervisor, and after Father's meeting the therapy with [Joyce] was terminated.

60.     Father did not tell Mother about the meeting with [A.M.]'s therapy team either before or after it occurred stating it was none of Mother's business.

61.     At final hearing, despite his position prior, Father now claimed he was supportive of [A.M.] obtaining therapy.

62.     Mother agreed Father could take charge of selecting a new counselor to avoid another fight and avoid any delay in [A.M.] receiving therapy.

63.     As of the date of the final hearing, no new counselor had been selected.

[….]

66.     Father's actions since the July 28, 2017 Order, including the incidents above, have caused delay in [A.M.] obtaining medical and mental health care.

[….]

73.     The Court finds it is in [A.M.]'s best interest that Mother be awarded sole legal custody with respect to healthcare decisions, including therapy and counseling decisions.  […]

74.     Mother shall continue to keep Father informed of all healthcare appointments for [A.M.].

75.     Father may not interfere with [A.M.]'s counseling, including making excessive contact with any provider.

Appellant's App. Vol. II pp. 26, 30, 31, 32, 33. Additionally, the trial court ordered that "Father shall never share a bed with [A.M.] and shall always provide her a separate place to sleep [and] shall never role play with [A.M.]" Appellant's App. Vol. II p. 35. Father did not appeal this order.

[6]     On July 11, 2019, during Father's parenting time with A.M., he was again arrested during a court hearing in Owen County for failing to register as a sex offender, and, instead of contacting Mother to inform her of his arrest and allowing her to retrieve A.M., allowed his friend April Bricker to take her. Mother learned of Father's arrest from his mother, eventually discovered Bricker's whereabouts, and, when she approached the front door of Bricker's residence, was told to leave or the police would be called. After making bail, Father arrived at Bricker's residence and refused to release A.M. to Mother's care. Later that day, Mother filed an emergency motion for modification of custody, request for modification of parenting time, and motion for rule to show cause why Father should not be held in contempt of court for failing to notify her of his arrest or offer her additional parenting time.

[7]     On August 19, 2019, Mother filed an additional motion for rule to show cause why Father should not be held in contempt for failure to pay child support as ordered. The same day, the trial court held a hearing at which Mother and Father testified. Father testified that he had two pending charges for Level 6

felony failing to register as a sex offender and acknowledged that he had not notified Mother when he was arrested on July 11. After the hearing, the trial court ordered a forensic psychosexual evaluation of Father. On October 17, 2019, Father pled guilty to one count of Level 6 felony failing to register as a sex offender.

[8]     On November 5, 2019, Father underwent a forensic psychosexual evaluation conducted by Ron Smith, MS, LMHC, LCAC, CADACIV. Smith interviewed Father and considered a summary of a March of 2019 assessment of alleged child abuse or neglect ("the Summary"). During the interview, Father denied that he needed help for sexually battering his stepdaughter. Smith noted that, according to the Summary, A.M. had been lying, stealing, and engaging in boyfriend-girlfriend role-playing with Father; she had grabbed the front of a two-year-old male cousin's pants; there were concerns that Father had been grooming her for sexual abuse and telling her to lie in therapy; and she had reported that she and Father would cuddle in bed together. Smith opined that Father was in denial regarding his risk level, with Father believing that he posed no threat to A.M. Smith also noted that Father had not completed any specialized sex-offender therapy that would reduce the risk of reoffending. On November 15, 2019, Father filed a motion for rule to show cause why Mother should not be held in contempt of court for interfering with his attempts to participate in A.M.'s therapy.

[9]     On November 18, 2019, the trial court held another hearing. Mother introduced evidence that Father had made only four child support payments

since March 22, 2019, and was currently $3776.00 in arrears. Mother testified that on September 6, 2019, Father asked if he could take A.M. to dinner with his mother during Mother's parenting time but, in fact, took her to a concert instead. Mother also testified regarding Father's interactions with A.M.'s therapists, first Joyce and then Maria Cottone. After Father met with Joyce's supervisor, A.M. was removed from school-based therapy with Joyce, which made scheduling and attending appointments more difficult for Mother, who testified that she now usually has to remove A.M. from school to attend. As for Cottone, Mother indicated that Father began calling her in October of 2019 and that she was concerned that his contact will lead to Cottone's removal as A.M.'s therapist. According to Mother, in video calls during Father's parenting time, she had seen A.M. and Father "laying on the couch together and watching movies and snuggling [with A.M.] on his lap." Tr. Vol. II p. 152. Mother testified that A.M. had had two bedwetting incidents since June of 2019 and one incident where she had stood in the hallway and urinated on the floor, fully awake. When asked if any changes in his behavior to A.M. would be appropriate given his conviction for a sex crime against her half-sister, Father indicated that "[n]o changes would be appropriate." Tr. Vol. II p. 189.

[10] On December 3, 2019, the trial court issued its order on pending matters, which order provided, in part, as follows:

CONTEMPT MOTIONS

27. Father is in contempt for failing to pay child support as ordered.

28.    Father paid no child support for the support of the parties' daughter from March 22, 2019 through October 1, 2019 and since March 22, 2019, Father has paid $230.00 in support.

29.    Father's current support arrearage has increased to $3,776.00 as of November 16, 2019.

30.    Father, by choice, remains self-employed in the resale business of buying and reselling used items at a mark-up despite Father having two bachelor's degrees.

31.    The Court admonishes Father to begin making child support payments as ordered and attorney fees are addressed below.

32.    At the time of the August 19, 2019 emergency hearing, Father still had yet to notify Mother that he had been arrested with the minor child despite the requirement in the Final Order that he communicate with Mother regarding his pending criminal case.

33.    The Court finds Father in contempt for failing to notify Mother that he had been arrested during his parenting time, failing to first offer Mother time with the Child instead of a family friend while he was in jail, and failing to provide Mother with contact information regarding the Child's whereabouts while he was in jail.

34.    The Court admonishes Father and orders Father to strictly comply with the prior orders regarding notifying Mother of his pending criminal matters and attorney fee sanctions are addressed below.

35.    There was no evidence before the Court that Mother interfered with Father's appointment with the Child's therapist.

36.    The evidence before the Court is that Father was able to have an appointment with the Child's therapist [Cottone] on November 13, 2019 and Father spoke with [Cottone] directly about the Child's therapy.

37.    There was no evidence that Mother cancelled said appointment and rescheduled it for November 15, 2019.

38.    The evidence also supports that Mother executed a release for Father to obtain the Child's therapy records, provided Father the name of the Child's therapist and that Mother has kept Father informed of the Child's appointments.

39.    The Court does not find Mother in contempt.

PARENTING TIME MODIFICATION

40.    The parties currently share legal custody with the exception that Mother was awarded sole legal custody with respect to healthcare decisions, including therapy and counseling decisions; and Mother having primary physical custody with Father exercising parenting time on alternating weekends, one additional weekend every 60 days, holiday parenting time, and extended summer parenting time with one extra week during the summer.

41.    Mother requested the Court order Father's parenting time with the Child supervised by an agency at Father's expense until Father completes a psychosexual education program as recommended by Ron Smith; or in the alternative, the Court order Father to exercise regular minimum Guideline parenting with no extra weekend and no extra time during the summer.

42.    Ind. Code §31-17-4-2 provides:

The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child.  However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

43.    The Indiana Court of Appeals:  "has affirmed the suspension of visitation 'at this time' where the father requesting

visits had sexually molested another of his children, the abuse had been substantiated, the father had threatened the oldest child with a loaded gun, and he showed no remorse and refused counseling sessions." See *Duncan v. Duncan*, 843 N.E.2nd 966, 972 (Ind. Ct. App. 2006).

44. The Indiana Court of Appeals has held that "unlike a modification of physical custody, a modification of parenting time does not require a showing of a substantial change". See *Miller v. Carpenter*, 965 N.E.2d 104, 110 (Ind. Ct. App. 2012).

45. In the instant case, there are several similar facts as to those in *Duncan*, mainly there is no dispute Father committed a sex crime against his step-daughter with whom he was residing, Father has not received specified counseling for the same, and Father's remorse is lacking.

46. The Court finds it concerning that, in light of the Final Order restricting Father's contact with [A.M.]'s mental health providers, Father continues to demand in person, personalized sessions with [A.M.]'s current therapist.

47. The Court finds it equally concerning that Father never notified Mother of his arrest on July 11, 2019 and then put [A.M.] in the care of a third party (who refused to release [A.M.] to Mother) .

48. Even after Mother filed her Emergency Motion to Modify, Father continued in a pattern of evasiveness when Father admittedly lied to Mother about taking [A.M.] to a concert for preteen girls.

49. Father acknowledged he told Mother his family was in town and had requested additional parenting time so [A.M.] could go out to dinner with her paternal grandmother.

50. Father acknowledges that at the time he made this request, he had no intent of taking [A.M.] to dinner with his family, but instead had plans to take [A.M.] to the Jojo Siwa (a preteen female musical artist) concert without telling Mother in advance.

51.     Father continues to demand Mother provide him private phone calls with [A.M.] and this is a continued source of dispute for the parties. Father places demands on Mother to notify him of all happenings in [A.M.]'s life, yet Father does not adhere to the same rules for himself when it comes to notifying Mother of important information regarding [A.M.].

53.     Given Father's criminal conviction for inappropriate sexual acts with a minor, this behavior is deeply concerning to the Court.

54.     The Court finds that Father's parenting time shall be restricted[,] and Father shall exercise supervised parenting time at an agency once per week for a period of up to three hours at Father's expense.

55.     The parties, if unable to coordinate the same amongst themselves, shall coordinate the supervised parenting time with the PC.

56.     Father's parenting time shall continue to be supervised until such time that Father has successfully completed a psychosexual educational program as recommended by Ron Smith by a provider specializing in the same. Ron Smith's report shall be provided to the provider in advance to ensure the topics listed in his report are covered.

57.     Father may petition the Court to amend the supervised parenting time upon completion of the educational program above.

ANCILLARY ISSUES

58.     The Final Order prohibiting Father from role playing with the Child and prohibiting him from sharing a bed with the Child remain in full force and effect.

59.     Father has shown a pattern of deliberately pushing the envelope regarding Court orders, including a prior incident where Father was found in contempt for his excessive farewells with the Child against the recommendation of the PC approved by and made an Order of this Court.

60.     Father is enjoined from the continued scheduling of in person appointments with [A.M.]'s therapist.  Such continued contact with [A.M.]'s therapist frustrates the Court's order enjoining Father from excessive contact with any of [A.M.]'s providers.

61.     The Court clarifies the June 25, 2019 Final Order and specifies that Father may contact [A.M.]'s therapist no more than once per month in writing at his own cost, if any.

62.     The Court cautions Father with regard to the frequency, duration and type of contact with [A.M.]'s providers moving forward.

63.     Father is not entitled to private phone calls with [A.M.].

ATTORNEY FEES

64.     The Court finds that Mother has incurred attorney fees due in large part to Father's arrest on July 11, 2019 and his behavior thereafter including several instances of being dishonest with Mother about [A.M.]'s whereabouts and his failure to pay child support.

65.     Additionally, due to the findings of contempt against Father herein, the Court orders Father to pay $2,000.00 toward Mother's attorney fees within sixty (60) days of this order, in addition to the fees already ordered against Father on June 25, 2019.

66.     Should Father fail to pay the same, that amount shall be reduced to judgment against Father and in favor of Mother, including statutory interest.

Appellant's App. Vol. II pp. 80–85.

# Discussion and Decision

# I. Terms of Visitation

Father alleges that the trial court abused its discretion in limiting him to supervised visitation with A.M., ordering that he have no private telephone calls with her, and imposing specific restrictions on his access to A.M.'s therapist. "Indiana has long recognized that the rights of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents." *Duncan*, 843 N.E.2d at 969 (citing *Lasater v. Lasater*, 809 N.E.2d 380, 400–01 (Ind. Ct. App. 2004)), *trans. denied*. "As a result a noncustodial parent is generally entitled to reasonable visitation rights." *Id.* (citing Ind. Code § 31-17-4-1). "A court may modify an order granting or denying visitation rights whenever this modification would serve the best interests of the child." *Id.* (citing Ind. Code § 31-17-4-2).

> When reviewing the trial court's resolution of the visitation issue, we reverse only when the trial court manifestly abused its discretion. *In re Marriage of Julien* (1979), Ind. App., 397 N.E.2d 651. If the record reveals a rational basis supporting the trial court's determination, no abuse of discretion occurred. *Carter v. Dec* (1985), Ind. App., 480 N.E.2d 564. We will not reweigh evidence or reassess the credibility of witnesses. *Id.*

*Pennington v. Pennington*, 596 N.E.2d 305, 306 (Ind. Ct. App. 1992), *trans. denied*.

As the Indiana Supreme Court has noted,

> The disposition of children presents a delicate and perplexing task which has taxed the wisdom of judges since the day of Solomon. The trial court is better able to arrive at a sound and safe conclusion than can a court of review which has only the cold printed or typed record before it. [E]ven where evidentiary facts are admitted different inferences and conclusions may be

drawn therefrom, and conclusions and judgments may hang upon intangibles and impressions not cognizable to a court of review.

*Gilchrist v. Gilchrist*, 255 Ind. 367, 372, 75 N.E.2d 417, 419 (1947).

[12] Indiana Code section 31-17-4-2 provides that:

> The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

Although the statute uses the word "might," Indiana Courts have long interpreted it to require evidence that parenting time "'would' (not 'might') endanger or impair the physical or mental health of the child." *Perkinson v. Perkinson*, 989 N.E.2d 758, 763 (Ind. 2013) (quoting *Stewart v. Stewart*, 521 N.E.2d 956, 960 n.3 (Ind. Ct. App. 1988), *trans. denied*). However, "unlike a modification of physical custody, a modification of parenting time does not require a showing of a substantial change." *Miller v. Carpenter*, 965 N.E.2d 104, 110 (Ind. Ct. App. 2012).

## A. Supervised Visitation

[13] The trial court ordered that Father's visitation with A.M. would be limited to supervised parenting time at an agency once a week for up to three hours at Father's expense. An order of supervised parenting time constitutes a restriction of parenting time pursuant to Indiana Code section 31-17-4-1. *Hatmaker v. Hatmaker*, 998 N.E.2d 758, 761 (Ind. Ct. App. 2013). A party who seeks to restrict a parent's visitation rights bears the burden of presenting

evidence justifying such a restriction. *Farrell v. Littell*, 790 N.E.2d 612, 616 (Ind. Ct. App. 2003). The burden of proof is by a preponderance of the evidence. *In re Paternity of W.C.*, 952 N.E.2d 810, 816 (Ind. Ct. App. 2011).

[14] The trial court ordered that Father's visitation rights be restricted based on the following findings: (1) Father committed a sex crime against his step-daughter, has not undergone targeted therapy related to that crime, and lacks remorse; (2) Father failed to notify Mother of his July 11, 2019, arrest and placed A.M. in the care of a third party; and (3) Father admittedly lied to Mother about taking A.M. to a concert instead of to dinner with his mother. We unsurprisingly consider the first of these justifications to be the most compelling. To date, Father has consistently maintained that his prior sexual battery does not need to be further addressed and has not participated in any targeted therapy. According to Father, no changes in his behavior regarding A.M. need to be made, despite evidence that he is in denial and engaging in grooming behavior. Father's lack of self-awareness and refusal to accept responsibility for his previous sexual battery are demonstrated by the fact that it was deemed necessary to not only order him not to cuddle with A.M., share a bed with her, or engage in boyfriend-girlfriend role-playing, but to reiterate in a second order not to do those things. Father's refusal to appropriately address concerns about his sexual battery of A.M.'s half-sister, along with his tendency to lie and violate court orders, fully justify an order limiting him to supervised visitation for the time being.

Father draws our attention to evidence that he does not pose a threat to A.M. and suggests that our disposition in *K.B. v. S.B.*, 415 N.E.2d 749 (Ind. Ct. App. 1981), supports a reversal in this case. To the extent that Father relies on some evidence from his therapist and Smith that he does not pose a threat to A.M., he is asking us to reweigh the evidence, which we will not do. *See, e.g.*, *Pennington*, 596 N.E.2d at 306. As for *K.B.*, it is true that it is a case in which we affirmed the trial court's grant of visitation to the father despite conflicting evidence that he had improperly fondled his daughter. *K.B.*, 415 N.E.2d at 751. *K.B.*, however, does not help Father, as it stands for nothing more than the proposition that we will not second-guess a trial court's determination in the face of conflicting evidence. *Id*. at 756. Contrary to Father's suggestion, *K.B.* most certainly does *not* support the notion that unsupervised visitation should always be granted whenever there is conflicting evidence of improper sexual behavior.

## B. Prohibition of Private Telephone Calls

Father contends that the trial court abused its discretion in ordering that he was not entitled to have private telephone calls with A.M. The Indiana Parenting Time Guidelines ("the Guidelines") outline rules for communication between a parent and a child and provide as follows:

> A child and a parent shall be entitled to private communications without interference from the other parent. A child shall never be used by one parent to spy or report on the other. Each parent shall encourage the child to respect and love the other parent. Parents shall at all times avoid speaking negatively about each

other in or near the presence of the child, and they shall firmly discourage such conduct by relatives or friends.

Ind. Parenting Time Guideline I(A)(2).

Section I(A)(3) of the Guidelines addresses telephonic communications in particular and provides as follows:

> Both parents shall have reasonable phone access to their child. Telephone communication with the child by either parent to the residence where the child is located shall be conducted at reasonable hours, shall be of reasonable duration, and at reasonable intervals, without interference from the other parent. If a parent uses an answering machine, voice mail or a pager, messages left for a child shall be promptly communicated to the child and the call returned.

So, while it is true that the Guidelines generally provide that telephone calls will be private, they provide for deviations when warranted:

> These Guidelines are applicable to all child custody situations, including paternity cases and cases involving joint legal custody where one person has primary physical custody. *However, they are not applicable to situations involving family violence, substance abuse, risk of flight with a child, or any other circumstances the court reasonably believes endanger the child's physical health or safely, or significantly impair the child's emotional development. In such cases one or both parents may have legal, psychological, substance abuse or emotional problems that may need to be addressed before these Guidelines can be employed.* The type of help that is needed in such cases is beyond the scope of these Guidelines.

Ind. Parenting Time G. Preamble (C)(1) (emphasis added).

We cannot say that the trial court abused its discretion in ordering that Father is not entitled to private telephone calls with A.M. As mentioned, there are indications in the record that Father is grooming A.M. for sexual abuse and

telling her not to talk in therapy, things that could, to say the least, endanger A.M.'s safety or significantly impair her emotional development. While Father would not be able to do such things in supervised visitation, he most certainly could in a private telephone call. Under the circumstances, Father has failed to establish an abuse of discretion in this regard.

## II. Access to A.M.'s Therapist

[20] Father contends that the trial court abused its discretion in limiting his access to Cottone to once-a-month contact in writing. As an initial matter, Father seems to argue that this restriction is tantamount to a complete denial of access to A.M.'s medical records as they relate to her therapy and cites to law related to access to such records. While it is generally true that "[a] custodial parent and a noncustodial parent of a child have equal access to the child's mental health records[,]" Ind. Code § 16-32-2-9(b), nothing in the trial court's order even suggests that it is restricting Father's access to A.M.'s mental-health records. The statutory and Guidelines provisions relied upon by Father have no bearing on this case.

[21] What we are left with, then, is the trial court's June 25, 2019, order that "Father may not interfere with [A.M.]'s counseling, including making excessive contact with any provider." Appellant's App. Vol. II p. 33. As mentioned, Father did not appeal from this order, so he is now limited to arguing that the trial court abused its discretion in applying it in its December 3, 2019, order. Father initially gave his consent to therapy for A.M. in or around August of 2018 before withdrawing it, forcing Mother to obtain a court order allowing therapy

to continue with Joyce. In the spring of 2019, however, Father demanded a meeting with Joyce's supervisor without informing Mother, after which school-based therapy with Joyce was terminated, which has caused Mother great inconvenience. Cottone began treating A.M. later in 2019, and Father began calling her in October of 2019 and met with her alone on November 13, 2019, causing Mother to indicate that she was concerned Father was attempting to have therapy with Cottone terminated.

[22] The trial court interpreted Father's actions as interference with A.M.'s therapy and excessive contact with Cottone, and we cannot say that its interpretation is unreasonable. Since initially giving and then withdrawing consent to A.M.'s therapy, Father has shown a pattern of interference with and resistance to it, up to and including causing (it would seem) therapy with Joyce to be terminated. Mother initially allowed Father to select a replacement for Joyce, which Father apparently never did. More recently, Father has sought in-person contact with Cottone, despite having unrestricted access to A.M.'s records and being fully informed of upcoming appointments. In our view, Father's interference with Cottone's treatment of A.M. fully justifies Mother's concerns that he will attempt to have Cottone removed as well. Father's history and recent actions support the trial court's findings that he was interfering with A.M.'s therapy and making excessive contact with Cottone, in violation of the June 25, 2019, order. Father has not established an abuse of discretion in this regard.

# III. Contempt

[23] Father contends that the trial court abused its discretion in finding him in contempt of court for failing to inform Mother when he was arrested on July 11, 2019, and for failing to offer her additional parenting time after his arrest.[1]

> The determination of whether a party is in contempt of court is a matter within the trial court's discretion and the trial court's decision will only be reversed for an abuse of that discretion. *Williamson v. Creamer*, 722 N.E.2d 863, 865 (Ind. Ct. App. 2000). A court has abused its discretion when its decision is against the logic and effect of the facts and circumstances before the court or is contrary to law. *Id*. When reviewing a contempt order, we will neither reweigh the evidence nor judge the credibility of witnesses. *Id*. Our review is limited to considering the evidence and reasonable inferences drawn therefrom that support the trial court's judgment. *Id*. Unless after a review of the entire record we have a firm and definite belief a mistake has been made by the trial court, the trial court's judgment will be affirmed. *Id*. Furthermore, this court will only reverse the trial court's contempt judgment if there is no evidence to support it. *Id*.

*Norris v. Pethe*, 833 N.E.2d 1024, 1029 (Ind. Ct. App. 2005). In order to be punished for contempt of a trial court's order, there must be an order commanding the accused to do or refrain from doing something, and the trial court must find that the party violated that order with willful disobedience. *Id*. Father bears the burden of showing that his violations of the trial court's orders were not willful. *See id*.

---

[1] Father does not contest the trial court's conclusion that he was in contempt of court for failing to pay child support.

## A. Failure to Inform Mother of Arrest

[24] The trial court found Father to be in contempt of court for failing to notify Mother of his July 11, 2019, arrest. The trial court's June 25, 2019, order, however, provided that "Father shall provide Mother […] notice of any changes *regarding the pending criminal case* within 24 hours of any change[,]" Appellant's App. Vol. II p. 35 (emphasis added), and the only criminal case that we are certain was pending against Father on June 25 was the charge of failure to register as a sex offender brought in cause number 60C01-1809-F6-0548, for which he had been arrested in October of 2018. In light of the fact that the order refers to "the pending criminal case[,]" we conclude that the only reasonable reading of this provision is that Father was obligated to inform Mother of developments in cause number 60C01-1809-F6-548 but not any others.

[25] Consequently, pursuant to the June 25 order's plain language, Father was under no obligation to notify Mother of his July 11, 2019, arrest in cause number 60C01-1906-F6-0407.[2] The trial court, we suppose, could have ordered Father to notify Mother of arrests or developments in any new criminal cases, but it did not. The trial court consequently abused its discretion in finding Father to

---

[2] It is undisputed that Father did not know about cause number 60C01-1906-F6-0407 until he was arrested on July 11, 2019. Moreover, while the cause number of the second charge indicates that it was filed in June of 2019, the record does not indicate that it was filed before June 25. Even if it had been, we do not think the trial court's order could be reasonably read to require Father to inform Mother of developments in criminal cases he did not even know existed. Finally, even if Father *had* been obligated to inform Mother of his July 11, 2019, arrest, the trial court's order provided that he had twenty-four hours to inform her. Mother, however, became aware of the arrest long before that. We are not certain that it would be reasonable to hold Father in contempt for failing to inform Mother of his arrest if his window for doing so had yet to close.

be in contempt of court for failing to notify Mother of his arrest on a new charge on July 11, 2019.

## B.  Failure to Offer Parenting Time to Mother

[26]   Father contends that the trial court abused its discretion in finding him in contempt of court for failing to offer Mother additional parenting time following his July 11, 2019, arrest, having Bricker take A.M. instead.  The trial court's June 25, 2019, order noted that an earlier order stated that "all other ancillary provisions of the [Guidelines] shall apply" and reiterated that "[t]he parties shall adhere to the [Guidelines] for summer parenting time[.]" Appellant's App. Vol. II pp. 24, 35.  The Guidelines provide, in part, that

> [w]hen it becomes necessary that a child be cared for by a person other than a parent or a responsible household family member, the parent needing the child care shall first offer the other parent the opportunity for additional parenting time, if providing the child care by the other parent is practical considering the time available and the distance between residences.

Parenting Time G. Section I(C)(3).

[27]   Father argues that it was not practical to offer Mother additional parenting time due to the distance involved and the immediacy of his situation, which was that he was being arrested.  The simple fact is that Father had no way of knowing whether it was practical to offer Mother parenting time unless he had actually contacted her and offered it to her, which he did not do.  Had Father contacted Mother, he would have known that she was available and approximately one hour and ten to fifteen minutes away in Fishers.  Instead, Father seems to have gone out of his way to make it difficult for Mother to ascertain A.M.'s

whereabouts. Father admitted that he did not call Mother, attempt to notify her by other means, or provide authorities with her contact information. Although Mother found out that Father had been arrested from his Mother, she had to call the jail to find out that Father had left A.M. with Bricker and, even then, had to conduct further investigation to learn Bricker's address. Moreover, Father could have asked the authorities in Owen County if it would have been possible to delay his formal arrest until Mother could arrive, something which had in fact occurred the first time he was arrested in October of 2018. Finally, while Father seems to have assumed that he would only be in custody a short while, we are not certain that such an assumption is warranted when one gets arrested. As it happened, Father was able to make bail, but only with help from his mother. Had Father's mother not been immediately available, or if bail had been set higher than it was, Father might have been incarcerated overnight or even longer. Under the circumstances, we cannot say that the trial court abused its discretion in finding Father in contempt of court for failing to offer Mother parenting time when he was arrested on July 11, 2019.

## IV. Attorney's Fees

Finally, Father argues that the trial court's award of $2000.00 of attorney's fees should be reduced proportionally in light of the fact that some were improperly awarded based on Father's failure to report his July 11, 2019, arrest to Mother.[3]

---

[3] Father actually argues that fees related to his failure to offer Mother additional parenting time should be eliminated also, but we have determined that the trial court properly held him in contempt for that failure.

Mother's attorney indicated in an affidavit of attorney's fees that, between July 11 and August 19, 2019, Mother had accrued $1200.00 in attorney's fees related to Mother's July 11 emergency motion for modification of custody, request for modification of parenting time, and motion for rule to show cause why Father should not be held in contempt of court for failing to notify her of his arrest or offer her additional parenting time. Also on August 19, 2019, Mother filed her second motion for rule to show cause, which was restricted to child support. By the hearing on November 18, 2019, Mother was requesting $2000 in attorney's fees, some of which were presumably accrued in further litigating her first motion for rule to show cause, and some of which were accrued in litigating her second. Based on the record before us, there is no way to determine with any degree of certainty how much of the $2000.00 award of attorney's fees was related to Mother's rejected claim that Father wrongly failed to inform her of his July 11, 2019, arrest. Consequently, we remand with instructions to determine this amount and reduce the award of attorney's fees accordingly.

[29] We affirm the judgment of the trial court in part, reverse in part, and remand with instructions.

Najam, J., and Mathias, J., concur.